ADELAIDE MaGEE *et als.*, vs. DOE, *ex dem.* CONSTANCE ALBA, AND OTHERS.

1. By making an act of Congress part of a special verdict of a jury (particularly where no objection to its admissibility in evidence appears in the record,) the Court will consider that the jury found all the facts stated and set forth in said act, whether the same were stated by way of inducement or otherwise.

2. The 8th Article of the Treaty of February 22d, 1819, between the United States and Spain, by which the Floridas were acquired, must be construed to stipulate expressly for the security to private property, which the laws and usages of nations would, without express stipulation, have conferred.

3. The operation of the said treaty as a *confirmation*, is the same upon a *purchase* of land of the Spanish Government, before the date fixed in the treaty, as upon a grant made by the Spanish authorities previous to that time, which is to confirm such grant or purchase "*in presenti*," and the language of the Spanish side or Spanish copy of the treaty, is substantially adopted as the true reading, viz: that such grants "*shall stand or remain ratified and confirmed,*" &c.

4. Under the said treaty, it was not contemplated that the Government of the United States should convey titles upon purchases made of Spain before 24th January, 1818, but only that the United States, after a change of dominion, should respect such purchases as were made of the Spanish Government before that time, and *ratify* and *confirm* the right which had, before that time, been acquired of the Spanish Government.

5. The report and abstract or decision of the Board of Land Commissioners, appointed under the act of Congress, approved May 8th, 1822, entitled "An Act for ascertaining claims and titles to lands within the Territory of Florida," in regard to claims and titles to lands in Florida, whether under grants from the Spanish Government or by purchase from said Government, are not final, and cannot have the force of *res adjudicata*, nor deprive them of any right which they may have had previous to said report and abstract or decision. That the object for which these commissioners were appointed was to enable the Government to *ascertain* the Spanish grants and sales, and their location, so that they might be separated from the public domain, and not sold as public lands. That for this purpose they "*constituted a board of inquiry, not a court exercising judicial power and deciding finally on titles.*" As to "Donation" claims—Quere?

6. It is inconsistent with all the acts of Congress and of our Courts, in adjusting land titles derived from the Spanish Government in Florida, prior to the date fixed by the treaty, to construe said acts in confirmation as a grant *de novo.*

7. The act of Congress, approved March 3, 1839, entitled "An Act for the relief of the heirs and assignees of Peter Alba, deceased," (and made part of the special verdict in this case,) is *confirmatory* of the pre-existing title of Peter Alba, Jr., ratifying and confirming the same, as by the treaty stipulation the Government was bound to do; and by the "relinquishment of any title which the United States may have to said lots," in said act, Congress but authorizes the separation of the land from the public domain, in order that they may not be sold as public lands, and therefore is *not,* to any intents and purposes, a grant *de novo.*

8. The *ganancial* rights and privileges of husband and wife, as to property acquired during coverture, under the Spanish law in force in Florida at the exchange of Flags, have been secured, and will be acknowledged in our Courts.

9. Those rights and privileges declared.

10. By the rules of descent in Florida, *real estate* descends, where there are no children nor their descendants, to the father, *excepting* in cases where husband is heir of his wife.

11. A devise of "*all the rest and residue of my property and estate,. real and personal, and of every kind and description whatesover,*" embraces the corpus of the testator's property not otherwise disposed of.

Appeal from the Circuit Court of Escambia County.
This cause was argued at March Term, 1860, at Mari-

384      SUPREME COURT.

MaGee et als., vs. Doe, ex dem.—Opinion of Court.

anna; was held under advisement by the Court, and by agreement of counsel the opinion of the Court was delivered at Tallahassee at January Term, 1861.

*Dillon Jordan*, *McClellan* and *Holland* for appellants.

*Richard L. Campbell* for appellees.

FORWARD J., delivered the opinion of the Court.

The appellees brought an action of ejectment in the Circuit Court, holden in and for the County of Escambia, to recover possession of the lots of land hereinafter described, situate and being in the city of Pensacola.

The jury empannelled to try the case brought in a special verdict, and judgment was rendered thereon in the Court below for the appellees, (who were the plaintiffs,) on which the appellants, (who were the defendants,) brought their appeal to this Court.

As appears by the record, the special verdict and judgment are in the following words, viz:

" We, the jury, find that Peter Alba, Jr., *claims to be the purchaser*, for a valuable consideration, from the Spanish Government, in the year 1817, of the lots described in the plaintiff's declaration; that the said Peter Alba, Jr., presented *his claim* to the commissioners appointed under the act of Congress, approved May 8th, A. D. 1822, entitled 'An Act for ascertaining claims and titles to lands within the Territory of Florida,' and that the said commissioners, in their report and abstract K, reported to Congress that the *evidence* before them proved that the certificates of sale of the said lots was a *forgery;* that *prior* to the purchase of the said lots, the said Peter Alba, Jr., intermarried with the said Constance Alba, one of the lessors of the plaintiff; that in the year A. D. 1833, Peter Alba, Jr., departed this life

without leaving any child or children; that Peter Alba, Sr., the father of the said Peter Alba, Jr., survived the latter; that the said Peter Alba, Sr., departed this life in the year 1836, leaving no lawful issue or descendants, and by his last will and testament, executed in due form to pass real estate under the laws of Florida, after several specific devises, in none of which were the said lots embraced, did, by the residuary clause of his said last will and testament, devise and bequeath, unto the said John Alba, (the illegitimate son of the said Peter Alba, Jr., and illegitimate grandson of the said Peter Alba, Sr.,) Virginia Alba, Angela Wilkins, wife of the said Joseph Wilkins, Peter Alba, Annette Alba, and Mary Louisa Alba, the lessors of the plaintiff, *all the rest and residue* of his property and estate, real and personal, and of, every kind and description whatsoever; that at the date of the act of Congress of March 3d, A. D. 1839, entitled 'An Act for the relief of the heirs and assignees of Peter Alba, deceased,' (which said act of Congress is hereby incorporated into and made a part of this special verdict,) the defendants, Adelaide MaGee, Drausin de Rocheblade, Delphine Jordan, wife of the said Charles N. Jordan, and Sophia Mason, wife of the said Felix G. Mason, were the sole heirs at law, then in being, of the said Peter Alba, Jr. And forasmuch as the jury is ignorant, in point of law, upon the foregoing facts, on which side they ought to find the issue, it is agreed that if the Court shall be of the opinion that the plaintiff is not entitled in law to the said lots upon the foregoing facts, then they find the defendants not guilty of the trespass and ejectment in the plaintiff's declaration alleged; but, if on the other hand, the Court shall be of the opinion, that the plaintiff is entitled to the whole, or any part of, or any interest in the said lots, in the said declaration set forth, then the jury find the defendants guilty of the said trespass and ejectment, in the said declaration

mentioned, to the extent to which the Court may deem the said plaintiff entitled to the said lots, and in that event assess the damages of the said plaintiff at one dollar.

"And the Court being of the opinion that the plaintiff is entitled to the whole of the premises in the declaration mentioned, to wit: Lots known in the plan of the city of Pensacola as numbers 342, 343, 344, 345, 366, 347, 327, 328, 335, 336, 337, therefore it is considered by the Court that the plaintiff recover against the defendant his term yet to come in the lots of land aforesaid, together with his damages assessed as aforesaid, and his costs by him about his suit in this behalf expended, and that the Sheriff of the county cause him to have his possession of his term aforesaid yet to come."

The act of Congress incorporated in, and made part of the special verdict, is as follows, viz:

"AN ACT FOR THE RELIEF OF THE HEIRS AND ASSIGNEES OF PETER ALBA, DECEASED.

"*Be it enacted, &c.,* That the title of the heirs of Peter Alba, late of Pensacola, in the Territory of Florida, deceased, or of such person or persons as by assignment from said Peter Alba may have claims thereto, to fifteen lots of land in the suburbs of the town of Pensacola, in the Territory of Florida, designated as follows, viz: numbers thirty, eighty-seven, three hundred and five, three hundred and twenty-one, three hundred and forty-two, three hundred and forty-three, three hundred and forty-four, three hundred and forty-five, three hundred and forty-six, three hundred and forty-seven, three hundred and twenty-seven, three hundred and thirty-five, three hundred and thirty-six, three hundred and thirty-seven, and three hundred and twenty-eight, *all of which were purchased* by the said Peter Alba, of the Spanish Government, in the year eighteen hundred and seventeen, be, and the same are hereby *confirmed*, res-

pectively to the heirs of the said Peter Alba, or to his assignee or assignees, to whom he may have conveyed the same, or any part of said lots, in his life time, according to the right which the said heirs, or assignee or assignees, may have thereto under the said Peter Alba : *Provided,* That this confirmation shall only extend to the relinquishment of any title which the United States may have to said lots.

" Approved March 3d, 1839."

On the part of the appellees it is contended that the jury in said special verdict found the following facts, to wit :

1st. That Peter Alba, Jr., was the purchaser, for a valuable consideration, from the Spanish Government, in 1817, of the said lots.

2nd. That at the time of the purchase of said lots, the said Constance Alba, one of the lessors of the plaintiff, was the wife, and is now the widow of said Peter Alba, Jr.

3d. That the said Peter Alba, Jr., in his life time, presented his claim or title to the Board of Land Commissioners appointed under the act of Congress, 8th May, 1822, and that said commissioners, in their report and abstract K, reported to Congress that the *evidence* before them proved that the certificates of sale of said lots were a *forgery.*

4. That in the year 1833, Peter Alba, Jr., departed this life, without leaving any child or children.

5. That Peter Alba, Sr., the father of said Peter Alba, Jr., survived the latter.

6. That the said Peter Alba, Sr., departed this life in the year 1836, leaving no lawful issue or descendants, and by his last will and testament devised and bequeathed, unto the said John Alba, the illegitimate son of the said Peter Alba, Jr., to Virginia Alba, Angela Wilkins, wife of the said Joseph Wilkins, Peter Alba, Annette Alba, and Mary Louisa Alba, six of the lessors of the plaintiff, all the right and title of said Peter Alba, Sr., deceased, which he inherited as heir

at law of Peter Alba, Jr., deceased, in and to said lots of land.

Upon this state of facts it is contended by the lessors of the plaintiff, that they have proved their title to said lots, and therefore the judgment of the Court below should be affirmed.

On the part of the defendants it is claimed that the special verdict ascertained the fact to be, and the jury so found, that at the date of the act of Congress of March 3d, 1839, (which said act is made a part of the verdict,) the *defendants* were the sole heirs at law, then in being, of the said Peter Alba, Jr., upon which the appellants contend that the plaintiff in the Court below ought not to recover on the demise of the lessors; and judgment of the Court should be reversed on the following grounds, viz :

1st. Because there was no evidence before the Court, by deed or otherwise, that Peter Alba, Jr., in his life time, had any title, legal or equitable, to the land in controversy.

2d. That the claim of Peter Alba, Jr., to these lots, was proved to be a forgery before the Board of Commissioners, and was therefore *rejected* by them ; and that their decision is conclusive.

3d. That Peter Alba, Jr., having in his life time no title to these lots of land, they did not, nor could not, upon his death, descend to his father, his then only surviving heir at law.

4th. That Peter Alba, Sr., having no title by descent, devise, gift or purchase, to these lots of land, neither at the time he made his said last will and testament nor at the time of his death, they did not pass by the residuary clause in his said last will and testament to such of the lessors of the plaintiff as are named in said will.

5th. That as Peter Alba, Jr., had no title to these lots of land, neither during his life time nor at his death, his sur-

viving wife, who is one of the lessors of the plaintiff, acquired no interest in the same by right of dower, nor as a ganancial interest under the Spanish law.

6th. That the act of Congress of 1839, does not profess, neither could it invest Peter Alba, Jr., (then dead) with a title to these lots of land.

7th. That the act of Congress, being a confirmation by a law, is as fully, to all intents and purposes, a grant, as if it contained in terms a grant *de novo*.

8th. That the said act of Congress being a *grant*, and the claim of Peter Alba, Jr., having been declared a forgery, Congress therefore had a right to treat the lots as public domain, (which in fact they were,) and grant the same to persons capable of taking such grant.

9th. That as Peter Alba, Jr., had no title to the same at his death, the question of descent does not arise in this case, and therefore such of his heirs as acquired a right to these lots of land, under this act of Congress, acquire it by purchase and not by descent.

10th. That the will of Peter Alba, Sr., did not convey these lots by its residuary clause to these lessors, because he had not the title to them, neither at the time he made said will nor at the time of his death.

11th. That this act of Congress has therein named the grantees, to wit: "the heirs and assignees of Peter Alba," expressly excluding his widow, which must be construed to mean the "heirs and assignees" *then* living.

12th. That the dead cannot inherit nor take by deed or devise, confirmation or *relinquishment,* and the appellants who were the defendants in the Court below, being the only surviving heirs of Peter Alba at the date of the passage of this act of Congress, they *alone* are entitled to the lots of land in controversy in this suit.

It appears in the record that the tenants in possession entered into the common consent rule, made themselves defendants and plead the *general issue.*

The title of the real plaintiffs in ejectment was controverted, and if they recover, they must do so only on the strength of *their own* title; to do which they must prove that they had the *legal estate* in the premises at the time of the demise in the declaration; that they had also the *right of entry,* and that the defendants were in *possession* of the premises at the time when the declaration in ejectment was served. An exception to this rule is where both parties claim under the same third person. It is in such cases *prima facie* sufficient to prove the derivation of title from him, without proving his title.

The demises appear to be severally laid in the declaration in this cause, and the date thereof is the first day of March 1857. Lease entry and ouster seem confessed, at least not questioned.

The first and main question submitted for the consideration of the Court is, do the facts in this case, as presented in the special verdict, show a legal title in the lessors of the plaintiff?

The deed or certificate of purchase from the Spanish Government to said Peter Alba, Junior, is not put in evidence .The only evidences of title are recited in the special verdict, in which the jury found—

*First.* That Peter Alba, Jr., *claimed* to be the *purchaser,* for a valuable consideration, from the Spanish Government, in 1817, of the lots described in the declaration.

*Secondly.* The jury make the act of Congress of the 3d March, 1839, entitled " An Act for the relief of the heirs and assignees of Peter Alba, deceased," a part and portion of their verdict; and it is insisted that the declarations or admission in the act, (the admissibility of which it will be

observed are not questioned by the parties,) together with the fact that Peter Alba, Jr., prior thereto, *claimed* to be a purchaser, for valuable consideration, of said lots, and that Congress was then acting on the said claim, are sufficient evidence of title.

This leads us to enquire, what is the effect of the Jury making the said act of Congress a part of their verdict?— We are of the opinion, that by making the act of Congress part of their verdict, particularly where no objection thereto appears in the record, the Jury found *all the facts* stated and set forth in said act, whether the same were stated by way of inducement or otherwise.

Upon examination of the testimony contained in the said act of Congress, we find it is stated, after enumerating the lots of land, being the same described in the declaration in this case, that " all which *were purchased* by the said Peter Alba, of the Spanish Government, in the year eighteen hundred and seventeen ;" which statement appears to us to be in clear and positive terms, that Peter Alba, junior, DID PURCHASE said lots of the Spanish Goverment in the year 1817. Add to this the further finding of the Jury, to-wit : " That Peter Alba, junior, *claimed* to be the purchaser, for a " valuable consideration, from the Spanish Government, in " the year 1817, of the lots described in the plaintiff's " declaration," and we have conclusive evidence that Peter Alba, junior, did purchase these lots of the Spanish Government in the year A. D. 1817.

The evidence being that Peter Alba, junior, purchased these lots of the Spanish Government prior to the cession of the Province of West Florida to the United States, the question arises, What was the effect of the treaty with Spain on this purchase ? Or in other words—whether these lots, at the exchange of flags, remained the property of Peter Alba, junior, or whether they became public lots of land,

and passed to the public domain of the United States of America?

This is not a new question in our Courts, although it may not have been decided by this Court.

The Supreme Court of the United States, and the Courts of Florida, have uniformly held, in construing the 8th article of the treaty of February 22nd, 1819, between the United States and Spain, so far as it is intended to protect or provide for the confirmation of private land grants made by the Spanish authorities in Florida previous to the 24th January, 1818, that the 8th article is to be considered as operating to confirm such grants "*in presenti*," and the language of the Spanish side or Spanish copy of the treaty is substantially adopted as the true reading, viz: That such grants "*shall stand or remain ratified and confirmed*," &c. U. S. vs. Arredondo and others, 6 Peters, 724 to 745; and U. S. vs. Percheman, 7 Peters, 86 to 89. The claim of Peter Alba, junior, being a *purchase* from the Spanish Government, is entitled to equal consideration, and the effect of the treaty in ratifying and confirming it is the same.

Suppose this *purchase* not to be within the express provisions of the treaty. The title of individuals would remain as valid under the new government as they were under the old; and those titles, at least so far as they were consummate, might be asserted in the Courts of the United States. A cession of territory is never understood to be a cession of the property of the inhabitants. The King cedes that only which belongs to him; lands that he had previously sold were not his to cede; *a fortiori*, the cession of a territory should necessarily be understood to pass the *sovereignty only*, and not to interfere with private property. U. S. vs. Percheman, 87. Ch. Jus. Marshall, in this case of Percheman, page 88, says: "This article is apparently introduced

" on the part of Spain, and must be intended to stipulate " expressly for that security to private property which the " laws and usages of nations would, without express stipula- " tion, have conferred."

We have here high authority that *purchases* from the Spanish Government are as "expressly" under the stipulation of the treaty as grants, and we have already seen that grants " *shall stand or remain ratified and confirmed,*" &c. We therefore hold that Alba, junior, in his life time, held by purchase these lots of land, at the exchange of flags, and that by the law of nations the right of property was protect- ed, and by express treaty stipulation, the treaty itself oper- ated as a confirmation, and therefore acquired and held, at his death, a legal title to said premises.

But say the Appellants, the claim of Peter Alba, junior, to be the purchaser for a valuable consideration from the Spanish Government, was not a good and valid one : it was *forgery*, and, therefore, would not have been ratified by the Spanish Government, and, therefore, should not be con- firmed by the American Government. That in reality there was no purchase of the lots, by Alba, junior, and in consequence thereof, these lots of land were public lands, and · Congress, by the Act of 1839, made a *grant* thereof to the heirs and assignees of Peter Alba, deceased.

There is no doubt that as between adverse claimants, under different titles, any admissions of the American Gov- ernment would not be binding, and the Appellants, claiming under an adverse title, might show that the conflicting claim was a forgery.

It will be observed that the pre-existing claim of Peter Alba, junior, that is to say " the certificates of sale" of the said lots, which are charged to be forgery, do not appear in evidence ; and all the testimony in support of the *forgery*,

is contained in the finding of the Jury, in their special verdict, which reads as follows, viz :

" That the said Peter Alba, junior, presented his claim to the commissioners appointed under the act of Congress, approved May 8, A. D. 1822, entitled An Act for ascertaining claims and titles to lands within the Territory of Florida, and that the said commissioners, in their report and abstract K, reported to Congress that the evidence before them proved that the certificates of sale of the said lots was a forgery."

Upon this state of facts, we are asked to conclude that the certificates of sale, set up as the pre-existing claim of Peter Alba, junior, are a *forgery*, and that the Act of 1839 is a donation to the heirs and assignees of Peter Alba, deceased, and was so intended by Congress.

To maintain this position of the Appellants, we will have to declare that the Board of Land Commissioners before whom John Alba, Jr., presented his claim, was a judicial tribunal, and will have to give the force of *res judicata* to their " *report.*"

This brings us to consider the nature and effect of the decision of this Board. And here again we can say that this is no new question. The Courts of Louisiana, the Supreme Court of the United States, and the Circuit Court of Florida, have uniformly decided it.

In the case of Boatner vs. Ventress, 4 Condensed Reports of the Supreme Court of Louisiania, page 650, the Court held that as to "donation claims in Florida," the decisions of the Board were final, and could not be re-examined in a Court of justice, upon the principle that the U. S. Government had the supreme right to dispose of its own property, in its own way ; these donation claims being the gift of the U. S. Government.

But says the Court, " If a legal title was vested in the

claimants, under the Acts of Congress already cited, at any time previous to the decree of the Commissioners, it is very clear, that a decision by officers of the Government cannot have the force of *res judicata*, nor deprive them of any right which they may have had previous to such decision."

So in this case, if Peter Alba, Jr., had a legal title vested in him, by the treaty already cited, at any time previous to the report of the Commissioners, their report cannot have the force of *res judicata*, &c.

The claim of Peter Alba, Jr., was not a *donation*, either of the Spanish or American Government; it was a *purchase* for a valuable consideration.

Again, in United States *vs.* Percheman, 7 Peters, 89, Chief Justice Marshall, in delivering the opinion of the Court, uses the following language in speaking of and reviewing the Act of Congress creating this Board of Land Commissioners, viz:

"It would seem from the title of the Act, and from the declaratory section, that the object for which these Commissoners were appointed was the ascertainment of these claims and titles. THAT THEY *constituted a board of inquiry, not a Court exercising Judicial power, and deciding finally on titles.*" "It was necessary to ascertain these claims, and to ascertain their location, not to decide finally upon them." * * * * "From this review of the original Act, it results, we think, that the object for which this board of Commissioners was appointed, was to examine into and report to Congress such claims as ought to be confirmed; and their refusal to report a claim for confirmation, whether expressed by the term 'rejected' or in any other manner, is not to be considered as a final judicial decision on the claim, binding the title of the party, but as a rejection for *the purposes of the act.*"

What were the purposes of the Act? The Supreme

Court, in the above Percheman case, gives the answer, which is: " *To obtain, with the utmost celerity, that information which ought to be preliminary to the sale of the public lands.*" That is to say: to enable the Government to *ascertain* the Spanish land grants, and sales, and their location—so that they might be *separated from the public domain*, and not sold as public lands.

Here, we think, we have a key to the Act of Congress of 1839. Congress in that Act declare, that Peter Alba *did purchase* of the Spanish Government, in 1817, said lots, &c. The Government here admits his pre-existing claim, the treaty confirms it, and this Act of Congress authorizes the separation of the land from the public domain, by " *relinquishment of any title which the United States may have to said lots.*"

In conformity with the uniform decisions in this respect, we think it is very clear that the report or decision by said Board of Land Commissioners, as to the evidence of forgery, cannot have the force of *res judicata*, nor deprive Peter Alba, Jr., of any right to said lots which he may have had previous to said report. Accordingly we are driven to decide, that Peter Alba, Jr., in his life time, had a good and valid title, by purchase of the Spanish Government, to said lots, and that the same was *confirmed* to him by the treaty.

On the part of the Appellants it is urged, that the Government by the Act of Congress of 1839, disregarded the *prior claim* of Peter Alba, Jr., and by that Act confirmed the lots in question to the *then* heirs and assignees of Peter Alba, Jr.; that this confirmation by this Act is as fully, to all intents and purposes, a grant, as if it contained in terms a grant *de novo*.

We have already stated what we think the objects of Congress were in the passage of this act. The very language

used in the act, which is patent upon the face thereof, precludes the idea that Congress *intended* a grant *de novo*.

But it may be urged that whatever the intention of Congress may have been, the *effect* of a confirmation, by act of Congress, is as fully to all intents and purposes a grant, as if it contained in terms a grant *de novo*.

The case of Strother vs. Lucas, 12 Peters, 412, does in words say and at first blush might be considered applicable to this case; but that case arose under the treaty by which Louisiana was ceded by France to the United States. The treaty by which Louisiana was acquired imposed only a *political* obligation upon the Government of the U. S. to perfect the titles, rights and claims originating under the former Government. The treaty itself did not, as in the case of the Florida purchase, operate as a confirmation. Chouteau *vs.* Eckhart, 2 Howard U. S. 345. Their being only a political obligation in Louisiana, it may be that a confirmation by a law is a grant *de novo* there. Under the treaty by which Florida was purchased, it was not contemplated that the Government of the United States should convey titles upon purchases made of Spain before 1818, but only that the United States, after a change of dominion, should respect such purchases as were made of the Spanish Government before the time designated in the treaty, and *ratify* and *confirm* the rights which had before that time been acquired of the Spanish Government.

In this case, we are of the opinion, that the Act of 1839 was confirmatory of the pre-existing title of Peter Alba, Jr., and that the heirs or assignees of Peter Alba, Jr., at his death, had the legal title in said estate.

This leads us to enquire who were the heirs or assignees of Peter Alba, Jr., at his death? who claim by derivative titles? and particularly whether the lessors of the plaintiff

in the Court below had the legal estate in the premises at the time of the demise in the declaration, and whether .they had also the right of entry, &c.

The verdict of the Jury found the fact to be, that Constance Alba, one of the lessors of the plaintiff, was the wife of Peter Alba, Jr., at the time of his purchase of these lots of land of the Spanish Government, and that as the same were acquired during their marriage, the lots being an *onerous increase* or gain-come under the Spanish laws in force at that time in the Province of West Florida, into partition, and therefore that she is the legal owner of one un-divided half of said lots.

This is not a new question either. The Courts of Florida have frequently adjudicated upon these rights of husband and wife, under the Spanish law, and uniformly held, as laid down by Mr. White, in his New Recompilacion, Vol. 1, page 61, that marriage, so far as property is considered, is to be considered in the light of a contract of partnership.

The right to *ganancias* is founded on the partnership or society which is supposed to exist between the husband and wife.

That *ganancial* property is all that which is increased or multiplied during marriage. By multiplied is understood all that is increased by *onerous* cause or title, and *not* that which is acquired by lucrative one, as inheritance, donation, &c. Says Mr. White:

"From all which it is inferred, 1st. That what the husband or wife bring into marriage, as their own peculiar property, or acquire during it by lucrative cause or title, does not come into partition.

"2rd. But that the property acquired during marriage by purchase, sale, or other onerous cause or title, *does*.

"3nd. That immediately upon a division being made of

·this *ganancial* property, each acquires an absolute dominion .as to their respective moieties or proportions.

"4th. That as the gains (ganancias) are common, so also are the injuries or damages which shall happen to them, unless they arise by the fault of only one of the partners."

These rights and privileges of husband and wife have been secured by .the Legislature of Florida.

See Thompson's Digest, page 220; Saul *vs.* his creditors, .5 Cond. Rep. Sup. Ct. Louisiana, page 663. This being ·the law governing the interest of Constance Alba, the wife· .and one of the lessors of the plaintiff, in these premises, it will be seen that she is not entitled directly to one half of .the land, but being entitled to one half of the gains during ·the marriage, and lands purchased being considered *gains*, ·these lots come into partition, and upon a division being ·made, each would acquire absolute dominion. Without un-dertaking to decide what the extent of interest may now .exist as between the said Constance Alba and the remain-ing lessors of plaintiff in these lots, it is only sufficient for us to decide, that by the Spanish Law in force in this State, she has secured to her an interest in *common* with her late husband's heirs or heir, and that she has an interest in these lands, in connection with the derivative title through her husband, sufficient to make her joinder as one of the lessors .of the plaintiff, proper and legal.

The special verdict found, that in the year A. D. 1833, Peter Alba, Jr., departed this life without leaving any child .or children; that Peter Alba, Sr., the father of the said Peter Alba, Jr., survived .the latter.

By the rules of descent which were in force in this State in the year 1833, *real estate* descends, where there are no ·children nor their descendants, to the father. By the act .subsequently enacted, the husband is made heir of his wife.

This then being the law of inheritance, it follows that as

Peter Alba, Jr., died intestate, having title to these lots, and left no child or children, nor the descendants of any children, and Peter Alba, Sr., his father, survived him, that therefore all right and title of Peter Alba, Jr., in and to said lots, became vested in his father.

The special verdict further found, that the said Peter Alba, Sr., (the father) departed this life in the year A. D. 1836, leaving no lawful issue or descendants, and by the residuary clause of his said will, after several specific devises, in none of which were the said lots embraced, devised and bequeathed, unto all the lessors of the plaintiff, *excepting* Constance Alba, all the rest and residue of his property and estate, real and personal, and of every kind and description whatsoever.

Such a devise embraces the corpus of the testator's property, not otherwise disposed of. 2 Jarman on Wills, 132, 139.

We have already stated that the Act of Congress of 3rd March, 1839, which was passed after the death of Peter Alba, Sr., was confirmatory of the title of Peter Alba, Jr.; that is to say, it confirmed and ratified the purchase made from Spain before the treaty. It is argued that the devisees of Peter Alba, Jr., are not mentioned in the act of Congress. The answer to this is the intention of that act, and this *intention* is readily ascertained by enquiring what was the necessity of the passage of the act, and what the object to be gained by it, either to the government or any person or persons claiming its passage? We conceive the objects of the act were two fold :

First. To ascertain and declare whether Peter Alba, Jr., did purchase these lots of the Spanish Government, in the year 1817, as he claimed to have done.

Secondly. To confirm his title, so that the lands embraced therein might be recognized by the government as separated from the public domain.

This is evident when we consider that when the *purchase* was ascertained, the treaty *confirmed* the title, and with this in view, we look at the proviso of the act, wherein it is stated, "THAT THIS CONFIRMATION SHALL ONLY *extend to the relinquishment of any title which the United States may have to said lots.*"

Relinquish it, to whom? To the person or persons claiming the confirmation. Who are claiming the confirmation? Those persons deriving title from the purchaser, (Peter Alba, Jr.) What title had the United States to relinquish? None, excepting the *separation* from the public domain, that is to say, the reservation of the lots from public sale, and a full recognition of these lots by the government as private property; and this we consider is all that Congress intended by this confirmatory act. This view of that act harmonizes with all the history of the government, respecting grants and purchases in Florida, prior to the date fixed by the treaty.

This act of Congress (which is made a part of the verdict,) declares that Peter Alba, Jr., *purchased* these lots of the Spanish Government. If he purchased them, (and the appellants have not shown that he did not,) then he held such an interest in these lots as would and did, at the time of his death, descend by the statute of descent or distributions to such person or persons as would at his death have answered to the description of his heir or heirs at law.— We cannot see by what authority Congress could have passed an act subsequent to this death of Peter Alba, Jr., which would change the legal course of descent and distributions, so as to give the property to such persons as might, in 1839, when the act was passed, answer the description of his heirs.

To suppose Congress intended to act so inconsistent with all its obligations under the treaty, and in violation of vested

rights, is coming to a conclusion not authorized by the wording and history of this act.

We conclude, then, that the appellees claiming under the purchase of Peter Alba, Jr., of the Spanish Government, whose claim was confirmed by operation of the said treaty, and subseqently ratified and confirmed by the said act of Congress, must prevail over the appellants who attempt to establish title under the said act of Congress alone.

The judgment of the Circuit Court is affirmed with costs.